UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------X
HILDA INEZ CARRETO,

                  Plaintiff,

                  - against -

CAROLYN W. COLVIN, Commissioner,
Social Security Administration,

                  Defendant.
----------------------------------------------------------X

**CORRECTED**
**MEMORANDUM AND ORDER**
15-CV-417 (RRM)

ROSLYNN R. MAUSKOPF, United States District Judge.

      Plaintiff Hilda Inez Carreto brings this action against defendant Carolyn Colvin, Commissioner of the Social Security Administration (the "Commissioner"), pursuant to 42 U.S.C. § 405(g), seeking review of defendant's determination that Carreto is not entitled to disability insurance benefits or Supplemental Security Income ("SSI") benefits. (Compl. (Doc. No. 1) at ¶¶ 1, 4.) Carreto requests that this Court remand the proceedings on the grounds of new and material evidence, legal error, and selective use of the evidence. (*Id.* at ¶ 9; Pl.'s Mem. Supp. Cross-Mot. (Doc. No. 24) at 1.) Carreto and the Commissioner have cross-moved for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c). (Pl.'s Mot. J. Pleadings (Doc. No. 23); Def.'s Mot. J. Pleadings (Doc. No. 21.) For the reasons set forth below, Carreto's motion is granted to the extent that the case is remanded for consideration of new evidence, and the Commissioner's motion is denied.

## BACKGROUND

### I.      Procedural History

      Carreto filed an application for disability insurance benefits on August 15, 2011, and an application for SSI benefits on August 23, 2011, alleging that she was disabled as of March 31,

2010, due to bulging discs, leg numbness, asthma, high blood pressure, depression, anxiety, and diverticulitis. (Admin. R. (Doc. No. 7) at 105–06, 188–96, 227.) Carreto's applications were denied on October 13, 2011. (*Id.* at 106–07, 113–22.) The Notice of Disapproved Claim states that "[Carreto has] some limitations in [her] activities. However, the severity of [her] condition does not totally disable [her]. While [she] may have difficulty in completing complicated tasks, [she] should have no difficulty in performing routine work." (*Id.* at 113.) Carreto then requested a hearing. (*Id.* at 123–24.) Upon an informal remand to the state agency, a revised determination was issued denying Carreto's claim. (*Id.* at 107–08.) On April 2, 2013, Carreto appeared with counsel at a hearing in front of Administrative Law Judge ("ALJ") Lisa B. Martin. (*Id.* at 54–76.) The ALJ issued a decision on April 15, 2013, finding that Carreto was not disabled. (*Id.* at 22–39.) She found that although Carreto had the following severe impairments: lumbar spine disorder, hypertension, asthma, obesity, history of colitis, depression, and anxiety, and although Carreto was unable to perform her previous work due to her impairments, "the claimant is capable of making a successful adjustment to other work that exists in significant numbers in the national economy." (*Id.* at 27, 33, 35.) The ALJ assigned "[l]ittle weight" to the opinion of Dr. Abby Letcher, Carreto's treating physician, because the limitations that Dr. Letcher described were not supported by Carreto's testimony and reported behavior. (*Id.* at 32.) The ALJ found that Carreto "did not explain why she failed to work at substantial gainful activity levels before her alleged onset date" and that she "is not a credible reporter of symptoms and limitations." (*Id.*)

Following the April 15, 2013 denial by the ALJ, Carreto presented several additional medical records to the Appeals Council, including the results of two magnetic resonance imaging scans ("MRIs") of the lumbar spine, dating from August 2013 through August 2014. (*Id.* at 2, 5–

17.) The ALJ's decision became the final decision of the Commissioner when the Appeals Council denied Carreto's request for review on November 25, 2014. (*Id.* at 1–4.) The Appeals Council stated that the additional evidence submitted by Carreto "does not provide a basis for changing" the ALJ's decision and that, because the medical evidence "is about a later time[,] . . . it does not affect the decision about whether you were disabled beginning on or before April 15, 2013." (*Id.* at 2.)

On January 23, 2015, Carreto filed the instant action against the Commissioner, alleging that the ALJ's decision "was erroneous, not supported by substantial evidence on the record and/or contrary to the law." (Compl. at ¶ 9.) Defendant maintains that the ALJ's determination of no disability was based upon proper evaluation of the evidence, and argues that "the additional proffered evidence is not material." (Def.'s Reply Mem. (Doc. No. 25) at 7.) Both Carreto and defendant have filed motions for judgement on the pleadings. (Pl.'s Mot. J. Pleadings; Def.'s Mot. J. Pleadings.)

## II.    Administrative Record

### a.  Non-Medical Evidence

Hilda Inez Carreto, born in October 1967, was forty-two years old on her alleged onset date, and forty-five years old at the time of the ALJ's decision. (Admin. R. at 58.) She attended high school and some college. (*Id.*) Between October 1998 and March 2010, Carreto worked at various times as a customer service representative, service dispatcher, caterer's helper, hotel housekeeper, and restaurant hostess. (*Id.* at 59–62, 234.)

In her function report dated September 12, 2011, Carreto stated that she lived alone and took care of two birds. (*Id.* at 243–44.) She shopped for food, clothes, and medications, once or twice a week for approximately one hour. (*Id.* at 244, 246.) She prepared small meals, twice per

day, which took twenty to thirty minutes.  (*Id.* at 245.)  She did laundry once a week, which took an hour, and cleaned two or three times a week, for thirty or forty minutes.  (*Id.*)  She stated that she could pay bills, count change, and use a checkbook and money orders.  (*Id.* at 246.)  She reported that one of her hobbies used to be going to the gym.  (*Id.* at 247.)  Carreto reported having "bad" pain that was present all day and every day, though she also had good days during which she had "moderate" pain."  (*Id.* at 252.)  She indicated that the pain started in her lower back and spread to her right leg, and that she had loss of feeling in her foot.  (*Id.*)  She stated that she could not do any lifting, and that it hurt to sit for longer than fifteen to twenty minutes.  (*Id.* at 248.)  She said she could not squat or bend due to lower back and leg pain, and that kneeling affected her lower back.  (*Id.*)  She reported that she could walk a block before needing to rest, and then would need to rest for five to ten minutes.  (*Id.*)  She indicated that she generally had no problems finishing what she started, following instructions, getting along with others, handling changes in routine, and handling stress.  (*Id.* at 248–49.)  She did not use an assistive device.  (*Id.* at 249.)

At the administrative hearing held on April 2, 2013, Carreto stated that she did not experience any symptoms from high blood pressure.  (*Id.* at 63.)  She reported that she experienced depression and anxiety because she could not work and be active.  (*Id.*)  With regard to her back, Carreto testified that she had not had surgery and was not currently taking any medications because she did not have insurance.  (*Id.* at 62.)  Carreto did not identify any side effects from her medications when she was taking them.  (*Id.* at 64.)  Carreto testified that she limped and that her right leg swelled.  (*Id.* at 65–66.)  She alleged that she could sit, stand, and walk, for fifteen to twenty minutes each.  (*Id.* at 69–70.)  Carreto testified that she did light

cooking and cleaning, a little bit at a time.  (*Id.* at 68.)  She reported that she could shop independently for her personal needs.  (*Id.* at 69.)

Carreto stated at the hearing that she had been laid off from her previous job when her employer relocated, and that this was unrelated to her impairments.  (*Id.* at 67.)  She alleged, however, that she would not have been able to work much longer had she not been laid off.  (*Id.*)

### b.  Medical Evidence Prior to Carreto's Disability Benefits Applications

### i.  Neighborhood Health Center of the Lehigh Valley

### 1.  Abby Letcher, M.D.

On April 1, 2010, Carreto saw Dr. Abby Letcher, a primary care physician at the Neighborhood Health Center of the Lehigh Valley ("Neighborhood Health"), regarding her blood pressure.  (*Id.* at 449–53.)  She reported increased stress, but that she was "doing great" in terms of her asthma.  (*Id.*)  She exercised at the gym four times a week.  (*Id.* at 450.)  She denied any back pain or loss of strength.  (*Id.* at 451.)  A physical examination was generally unremarkable.  (*Id.* at 451–52.)  Dr. Letcher diagnosed benign hypertension, and asthma, for which she prescribed maintenance medications.  (*Id.* at 452.)

Carreto returned to Dr. Letcher on June 4, 2010, complaining of depression and anxiety for the past two months.  (*Id.* at 445–48.)  She reported wishing that she were dead, and that she felt that life was not worth living.  (*Id.* at 445.)  She cleaned "all day" in order to distract herself from her problems.  (*Id.*)  On examination, Carreto was tearful and anxious, with a sad mood; however, her insight was appropriate, her judgment was normal, her affect was of normal range, and her stream of thought was clear.  (*Id.* at 447.)  Dr. Letcher noted no physical abnormalities. (*Id.*)  She added depression/anxiety as a diagnosis and prescribed citalopram (Celexa) and diazepam (Valium).  (*Id.*)

When Carreto next saw Dr. Letcher on June 25, 2010, she reported that, despite not starting citalopram, she felt much better; she was less irritable, and had better concentration. (*Id.* at 441.) She continued to exercise four times per week. (*Id.*) On examination, Dr. Letcher noted that Carreto's lungs showed good air movement, with no crackles or rhonchi, and readily cleared with the use of Albuterol. (*Id.* at 443.) Overall, Dr. Letcher noted no abnormalities. (*Id.*) On psychiatric examination, Carreto had focused concentration, appropriate insight, a "fine" mood, and a normal range of affect. (*Id.*) Dr. Letcher discontinued diazepam and started Carreto on the citalopram that she was previously prescribed. (*Id.*)

Carreto had an appointment with Dr. Letcher on June 17, 2011 regarding her back pain. (*Id.* at 417–20.) Carreto stated that the medications prescribed by Dr. Romero, discussed *infra*, brought minimal relief. (*Id.* at 417.) Acupuncture, on the other hand, had helped for a few days, but Carreto had not followed up. (*Id.*) Carreto also reported that she had been using her inhaler daily for asthma, with temporary relief. (*Id.*) On examination, Dr. Letcher noted foot drop and decreased sensation in Carreto's right leg. (*Id.* at 418.) She prescribed a steroid medication and referred Carreto for additional acupuncture. (*Id.* at 418–19.)

When Carreto returned to Dr. Letcher on July 15, 2011, she continued to experience foot drop on her right side. (*Id.* at 412–14.) She reported severe back pain and that she could not function on some days even with her medications. (*Id.* at 412.) Ibuprofen gave her some pain relief, but steroids did not help. (*Id.*) Dr. Letcher referred Carreto to a neurosurgeon. (*Id.* at 413.) Dr. Letcher's treatment note states that Carreto did not want to take any narcotic medication. (*Id.*)

## 2. Frances Romero, M.D.

On February 17, 2011, Carreto saw Dr. Frances Romero, a primary care physician at Neighborhood Health, complaining of lower back pain. (*Id.* at 435–38.) Carreto reported that she had fallen six weeks earlier, and now had pain radiating to her right foot, with numbness in two of her toes. (*Id.* at 435.) On examination, Dr. Romero noted an unspecified decreased range of motion and lordosis of the spine. (*Id.* at 437.) A straight leg raising test was positive, and there was left sciatic notch tenderness. (*Id.*) Carreto had a normal heel-toe gait pattern, and no tenderness upon palpation of the spine. (*Id.*) Dr. Romero prescribed ibuprofen and Flexeril, and ordered x-rays and physical therapy ("PT"). (*Id.* at 437–38.)

X-rays of Carreto's lumbosacral spine, taken March 7, 2011, showed no evidence of fracture or spondylolisthesis; there was moderate degenerative disc disease at L4–L5, mild degenerative disc disease at L5–S1, and mild right and moderate left degenerative changes at the L5–S1 facet joints. (*Id.* at 600.)

Carreto returned to Dr. Romero on March 10, 2011, to follow up on her back pain, and also to address pain in both legs. (*Id.* at 432–34.) She had not taken Flexeril due to abdominal upset. (*Id.* at 432.) Dr. Romero again noted an unspecified decreased range of motion and lordosis, but no other abnormalities. (*Id.* at 434.) She ordered PT and acupuncture, and prescribed Tramadol. (*Id.*)

### 3. Ina Grundmann, M.D.

On March 11, 2011, Carreto saw Dr. Ina Grundmann, an acupuncturist at Neighborhood Health. (*Id.* at 429–31.) Carreto reported that she went to the gym, read, and took long drives. (*Id.* at 429.) She reported that her pain was worse with moving and got better with rest. (*Id.*) On examination, Carreto was noted to be cooperative, pleasant, well-nourished and in no acute distress. (*Id.*) Decreased sensation was noted in her right leg and foot. (*Id.* at 430.) She had

mildly decreased dorsiflexion range of motion of her foot, but no edema.  (*Id.*)  She had an antalgic gait on the right side, indicating some pain when walking, and deceased right quadriceps strength relative to her left side.  (*Id.*)  Her mood, affect, attention span and concentration were normal.  (*Id.*)  Carreto tolerated acupuncture well and saw immediate benefit, including increased sensation in the right leg, increased range of motion and strength of the right foot, increased strength in the right quadriceps, improved ambulation, a less antalgic gait, and decreased pain/pressure in the low back/central spine area.  (*Id.*)

On June 17, 2011, Carreto went again for acupuncture.  (*Id.* at 415–16.)  On examination, she was noted to be cooperative, pleasant, and well-nourished.  (*Id.* at 415.)  She had antalgia and was in mild distress due to pain.  (*Id.*)  Decreased sensation was noted on the lateral right leg and foot to the fourth and fifth digits.  (*Id.*)  Her foot had mildly decreased dorsiflexion range of motion.  (*Id.*)  She had antalgic gait on the right side, and deceased right quadriceps strength relative to her left side.  (*Id.*)  Her mood, affect, attention span and concentration were normal. (*Id.*)  She responded positively to acupuncture, with increased range of motion and foot strength. (*Id.*)  She had increased sensation in the right lower extremity, and the pain or pressure in her lower back was "all but resolved."  (*Id.* at 415–16.)

### 4.  Christopher Sander, M.D.

On May 9, 2011, Carreto saw Dr. Christopher Sander of Neighborhood Health, complaining of worsening pain in her back that radiated down her right leg, as well as blurred vision and urinary leakage.  (*Id.* at 425–28.)  She had unilateral right leg weakness and no upper extremity weakness.  (*Id.* at 425.)  On examination, she was in moderate distress due to pain. (*Id.* at 427.)  There was decreased sensation to pinprick in Carreto's thigh.  (*Id.*)  Dr. Sander administered an injection of Toradol and ordered an MRI of Carreto's lumbar spine.  (*Id.* at 425–

26, 428.)  The MRI, performed May 23, 2011, showed a posterior disc bulge, with a superimposed central disc herniation, causing moderate spinal stenosis and mild to moderate bilateral foraminal narrowing (narrowing of the lumbar disc space and compression of the spinal nerve root) at L4–L5.  (*Id.* at 386.)  There was also moderate left foraminal narrowing at L5–S1 attributed to a left foraminal and far left lateral disc protrusion.  (*Id.* at 386–87.)

### 5. Osteopathic Manipulative Medicine Clinic

Carreto visited the osteopathic manipulative medicine clinic at Neighborhood Health on May 24, 2011.  (*Id.* at 421–24.)  Dr. Roland Newman II, D.O., reviewed her history, and noted that Carreto was exercising regularly.  (*Id.* at 421–22.)  On examination, Carreto had diminished sensation and mild weakness in her right leg, as well as paraspinal spasm and tenderness; her gait was normal.  (*Id.* at 423.)  Dr. Newman believed that the disc bulge was the likely cause of her symptoms, and advised that her primary care physician should address this issue.  (*Id.* at 424.) She was to continue PT, *see infra*, as tolerated.  (*Id.*)

### ii. Good Shepherd Rehabilitation Network

Carreto presented for an initial PT evaluation on March 31, 2011 with therapist Jaime Brunnabend, P.T., at Good Shepherd Rehabilitation Network ("Good Shepherd").  (*Id.* at 506–10.)  She had good standing posture during the evaluation.  (*Id.* at 507.)  Carreto's range of motion in her legs and lumbar spine were within functional limits, and Ms. Brunnabend noted that Carreto was, in fact, very flexible.  (*Id.* at 508.)  Strength was reduced in both legs, more so on the right, and muscle atrophy was evident.  (*Id.*)  Sensation was also reduced in the right leg, and Carreto's gait was antalgic.  (*Id.*)  A straight leg raising test was positive, her spine was tender to palpation, and muscle spasm was evident.  (*Id.*)  Carreto did not return for PT until April 21, 2011.  (*Id.* at 503.)  A week later, on April 29, 2011, physical therapist Carla Staack,

P.T., M.S.P.T., of Good Shepherd noted that Carreto had not improved over that past month, but had only sporadic attendance. (*Id.* at 495.)

### iii. Lehigh Valley Hospital Emergency Room

On May 5, 2011, Carreto presented to the emergency department ("ER") at Lehigh Valley Hospital, complaining of back pain that radiated to her lower right extremity. (*Id.* at 276–309.) On examination, there was moderate muscle spasm in Carreto's right posterior back, and moderate soft tissue tenderness in the right middle and lower thoracic areas. (*Id.* at 278, 280.) However, her extremities were not tender and she exhibited normal range of motion on testing. (*Id.*) There were no motor or sensory deficits, and a straight leg raising test was negative bilaterally. (*Id.* at 278.) Physician Assistant Kenneth Rachwal noted left sided lumbar radiculopathy and a drug rash. (*Id.* at 280.) Carreto was prescribed Vicodin, Robaxin, and Medrol Dosepak, and was discharged in stable condition. (*Id.* at 280, 286.)

On August 12, 2011, Carreto visited the ER at Lehigh Valley Hospital for abdominal pain. (*Id.* at 310–54, 566–99.) She was diagnosed with colitis or diverticulitis, administered antibiotics, and discharged in improved condition. (*Id.* at 313.)

### c. Medical Evidence After Carreto's Disability Benefits Applications

### i. Neighborhood Health

#### 1. Abby Letcher, M.D.

When Carreto returned to Dr. Letcher on August 29, 2011, she reported that her back pain, with radiculopathy and foot drop, was getting gradually better. (*Id.* at 408.) Examination findings remained unchanged. (*Id.* at 409.) Also on August 29, 2011, Dr. Letcher completed a Residual Functional Capacity Questionnaire. (*Id.* at 355–56.) She assessed chronic lower back pain and severe radiculopathy, with a fair prognosis. (*Id.* at 357.) She also reported that Carreto

had pain in her lower back, right leg, and neck, as well as a limp, dizziness, sleep deprivation and fatigue. (*Id.*) Carreto was taking amitriptyline, which had side effects of drowsiness and dizziness. (*Id.*) Dr. Letcher stated that Carreto could walk less than one city block, and that she could sit for twenty minutes at a time, and for up to two hours total during an eight-hour workday. (*Id.*) She indicated that Carreto could stand for ten minutes at a time, but marked on a zero-to-eight-hour scale that Carreto would not be able to stand for an hour total during an eight-hour workday. (*Id.*) Dr. Letcher stated that Carreto would need hourly breaks, lasting ten to twenty minutes each. (*Id.*) According to Dr. Letcher, Carreto could never lift any amount of weight. (*Id.* at 356.) She could use her hands, fingers, and arms for fifty percent of the workday. (*Id.*) Dr. Letcher believed that Carreto would miss work more than four times a month. (*Id.*)

On September 26, 2011, Carreto told Dr. Letcher that amitriptyline was "really helpful" for pain and sleep. (*Id.* at 378.) Carreto's mood was better, but she was stressed about losing her apartment and was sad about her financial situation. (*Id.*) Carreto reported walking without assistive devices. (*Id.* at 379.) Dr. Letcher's findings were generally unchanged and she ordered pain management and PT. (*Id.* at 379–80.) Also on September 26, 2011, Dr. Letcher completed a Mental Capacity Assessment form. (*Id.* at 373–75.) Dr. Letcher stated that Carreto had poor concentration exacerbated by pain and anxiety. (*Id.* at 373.) Dr. Letcher reported that Carreto had slight to moderate limitations in understanding and memory, slight to extreme limitations in sustained concentration and persistence, slight limitations in social interaction, and slight to moderate limitations in adaption. (*Id.* at 373–75.) Carreto was diagnosed with major depression with anxiety. (*Id.* at 373.)

When Carreto saw Dr. Letcher on October 31, 2011, for a routine gynecological examination, she continued to report that she was not interested in narcotic medication for her back pain and wanted to pursue only non-surgical interventions.  (*Id.* at 403–07.)

Carreto returned to Dr. Letcher on July 26, 2012 and reported that she felt stressed because of financial problems, and complained of difficulties with memory and sleep.  (*Id.* at 716–17.)  She also complained of ongoing back pain, radiating to her foot.  (*Id.*)  Carreto reported that she did not use any assistive device, did not feel unsteady on her feet, and had not fallen in the past year.  (*Id.* at 719.)  Dr. Letcher did not note any physical problems on examination.  (*Id.* at 719–20.)  She observed that Carreto's mood was sad, but her affect was of normal range, her speech was appropriate in rate and tone, and her stream of thought was focused.  (*Id.* at 720.)  For Carreto's reported back pain, Dr. Letcher prescribed Lidoderm and increased Carreto's dose of amitriptyline.  (*Id.*)  Carreto still wanted to avoid narcotics.  (*Id.*)

### 2.  Mei Wong, M.D.

On August 30, 2011, Carreto saw Dr. Mei Wong, a neurologist, for her complaints of back pain.  (*Id.* at 360–63.)  On examination, Carreto had an antalgic gait and decreased sensation to light touch in her right foot and ankle.  (*Id.* at 362.)  Otherwise, there were no focal deficits, and Carreto had normal reflexes, coordination, and muscle strength and tone.  (*Id.*)  Dr. Wong discussed a surgical treatment option with Carreto, but Carreto preferred to avoid surgery and proceed with a more conservative approach.  (*Id.* at 363.)

### ii.  Good Shepherd

On September 22, 2011, Carreto was discharged from PT at Good Shepherd after failing to return for some time.  (*Id.* at 486–89.)  Carreto presented for another PT evaluation at Good Shepherd on October 3, 2011.  (*Id.* at 482–85.)  Therapist Joseph DeRea, P.T., reported findings

that were generally unchanged from prior PT assessments, and Mr. DeRea recommended a program of aquatic therapy.  (*Id.*)  On October 11, 2011, Carreto related that her back felt looser with less pain after her pool exercises.  (*Id.* at 480–81.)  She reported a pain level of seven on a scale of one to ten, with the most pain occurring when walking.  (*Id.* at 480.)  On October 25, 2011, Carreto was walking better after her aquatic therapy session and did well with her exercises.  (*Id.* at 477.)

In November and early December 2011, Carreto's lumbar range of motion and lower abdominal strength improved with aquatic therapy, although she continued to experience ongoing pain and some functional limitations.  (*Id.* at 460–75.)  She reported decreased pain (5/10) after using the pool.  (*Id.* at 469 ("I feel better after the pool"); *see also id.* at 466 (4/10 post-therapy), 473 (5/10 post-therapy).)

### iii.  Emergency Room Visits

#### 1.  St. Luke's Hospital

On March 17, 2012, Carreto presented to the ER at St. Luke's Hospital for an asthma exacerbation, and was given Albuterol.  (*Id.* at 513–19.)

Carreto went back to St. Luke's Hospital ER for an asthma attack on November 19, 2012. (*Id.* at 723–32.)  Review of systems was normal, and physical examination showed no motor deficits, and no extremity weakness or edema.  (*Id.* at 728.)  Psychiatric examination revealed normal mood and affect.  (*Id.*)  Carreto was given medication and discharged in much improved condition.  (*Id.*)

#### 2.  Lehigh Valley Hospital

Carreto was seen at Lehigh Valley Hospital on April 21, 2012 for an asthma attack.  (*Id.* at 532–52, 610–709.)  She had not been taking her medication (Singulair) for the past several

months due to her insurance changing.  (*Id.* at 672.)  Carreto was given steroids, a nebulizer, Albuterol, and Singulair, and she was discharged on April 23, 2012, in improved condition.  (*Id.* at 672–73.)

### 3.  Flagler Hospital

On February 26, 2013, Carreto presented to Flagler Hospital with a necrotic wound on her right thigh.  (*Id.* at 736–57.)  On examination, she displayed normal range of motion, normal strength, no tenderness, swelling, or deformity, a normal gait, and no focal deficits.  (*Id.* at 741, 744, 750.)  Carreto was given antibiotics, improved significantly, and was discharged on March 1, 2013.  (*Id.* at 736.)

### iv.  Consultative Examiners and Record Reviews

### 1.  James Vizza, Psy.D.

On October 13, 2011, Dr. James Vizza, a state agency psychological consultant, reviewed Carreto's medical record and concluded that she had affective and anxiety-related disorders, manifesting in no restrictions on activities of daily living, mild difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence, or pace, and no episodes of decompensation.  (*Id.* at 82.)  Dr. Vizza specifically noted that Carreto was not receiving any specific mental health treatment, and that Carreto's primary care physician was managing her symptoms of depression and anxiety with medication.  (*Id.*)

### 2.  Disability Adjudicator Melissa Seelye

On October 13, 2011, Disability Adjudicator ("DA") Melissa Seelye completed a Disability Determination Explanation and made a finding of no disability, though she did conclude that Carreto had several impairments.  (*Id.* at 104.)  DA Seelye noted an impairment diagnosis of "DDD [degenerative disc disease] Severe," along with other severe impairment

diagnoses of asthma, hypertension, and affective and anxiety disorders. (*Id.* at 96.) DA Seelye

concluded further that Carreto could lift twenty pounds occasionally and ten pounds frequently,

could stand/walk for four hours and could sit for about six hours in an eight-hour workday, could

never climb ladders, ropes, or scaffolds, could occasionally perform all other postural activities,

and should avoid concentrated exposure to fumes, odors, dusts, gases, and poor ventilation. (*Id.*

at 98–99.)

### 3. James Upchurch, M.D.

On April 3, 2012, Dr. James Upchurch, a state agency medical consultant, reviewed the

record and affirmed DA Seelye's earlier functional assessment. (*Id.* at 520–23.)

### d. Non-Duplicative Medical Evidence Submitted to the Appeals Council

On August 28, 2013, an MRI of Carreto's lumbar spine was taken at Bay Ridge Medical

Imaging in Brooklyn, New York. (*Id.* at 6–9.) The MRI results showed L2–S1 degenerative

disc disease, L2–L5 retrolisthesis, an annular fissure at L3–L, and mild levoscoliosis. (*Id.*)

Nurse practitioner ("NP") Anne Fraser, who had cared for Carreto since August 2013,

summarized the August 2013 MRI, noting "multilevel disc herniation" that caused "significant

pressure to the nerves innervating the right leg, resulting in severe pain and altered sensation to

the leg." (*Id.* at 5.)

On December 26, 2013, Carreto presented at Lutheran Medical Center for a nerve

conduction study and brief physical examination. (*Id.* at 10–14.) Examination revealed that she

had good strength and range of motion in her lower extremities, but pain and weakness in the

ankle and top of the foot on the right side. (*Id.* at 10.) Sensation was intact to light touch with

decreased sensation in the lower right leg and dorsum of the right foot. (*Id.*) She had an antalgic

gait on the right side. (*Id.*) The nerve conduction study showed signs of acute right lumbar radiculopathy. (*Id.*)

On April 8, 2014, Carreto saw Dr. Lorenzo Hughes, and received an epidural steroid injection for L4–L5 lumbar radiculitis. (*Id.* at 17.) On August 6, 2014, a second MRI, this time of Carreto's cervical spine, revealed stenosis at C5–C6. (*Id.* at 15.) On September 9, 2014, Carreto returned to Dr. Hughes, where she received a second steroid injection for L4–L5 lumbar radiculitis. (*Id.* at 16.)

### e. Additional Evidence Presented by Carreto as New and Material

On January 21, 2015, a lumbar spine MRI was taken at Bay Ridge Medical Associates. The MRI results confirmed previous diagnoses of L2–S1 degenerative disc disease, L2–L5 retrolisthesis, an annular fissure at L3–L4, and mild levoscoliosis in the lumbar spine. (Pl.'s Additional Evid. (Doc. No. 24-1) at 9–11.) The MRI also showed further spinal deterioration, with a new diagnosis of L4–L5 advanced degenerative spondylosis. (*Id.*) On March 16, 2015, Carreto presented for an appointment with primary care physician Dr. Polina Tavrovskaya. Carreto was assessed for cervical radicular pain and spinal stenosis of the lumbar region with radiculopathy, or nerve damage and compression. (*Id.* at 14–15.) On March 26, 2015, Carreto saw Dr. Hughes for bilateral lower lumbar pain, right lower extension, and left knee pain. (*Id.* at 16.) Carreto returned to Dr. Tavrovskaya on May 14, 2015, and was again assessed for lumbar radicular pain and spinal stenosis of the lumbar region with radiculopathy. (*Id.* at 18–19.)

On June 24, 2015, Carreto had a physical therapy session, the clinical report for which notes lumbar flexion of only 36 degrees. (*Id.* at 23–25.) On September 17, 2015, Carreto had another appointment with Dr. Hughes, who ordered a fourth lumbar spine MRI. (*Id.* at 30–31.) On September 24, 2015, Carreto had a fourth lumbar spine MRI, which was taken at Bay Ridge

Medical Imaging and confirmed prior diagnoses. (*Id.* at 33.) On September 29, 2015, Carreto received a third steroid injection from Dr. Hughes for L4–L5 lumbar radiculitis. (*Id.* at 35–38.)

### f. Vocational Expert Rebecca Hayes

Rebecca Hayes, a vocational consultant, testified as a vocational expert at Carreto's April 2, 2013 hearing. (Admin. R. at 71–74.) The ALJ asked Ms. Hayes to consider a hypothetical individual of the same age as Carreto, with the same education, work experience, and residual functional capacity. (*Id.* at 72.) Ms. Hayes identified the following jobs that such a hypothetical individual could perform: (i) Cashier II (Dictionary of Occupational Titles ("DOT") No. 211.462-010), with 1,000,000 jobs nationally and 50,000 regionally (after accounting for Carreto's need to alternate between sitting and standing as often as every 30 minutes); (ii) stock checker, apparel (DOT No. 299.667-014), with 7,000 jobs nationally and 450 regionally; and (iii) merchandise marker (DOT No. 209.587-034), with at least 400,000 jobs nationally. (*Id.* at 72–73.)

## STANDARD OF REVIEW

### I. Review of Denial of Social Security Benefits

The Court does not make an independent determination about whether a claimant is disabled when reviewing the final determination of the Commissioner. *See Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998). Rather, the Court "may set aside the Commissioner's determination that a claimant is not disabled only if the [ALJ's] factual findings are not supported by 'substantial evidence' or if the decision is based on legal error." *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000) (quoting 42 U.S.C. § 405(g)). "'[S]ubstantial evidence' is 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept

as adequate to support a conclusion.'" *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013)

(quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

"In determining whether the agency's findings were supported by substantial evidence, the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn." *Id.* (internal quotation marks omitted). "If there is substantial evidence in the record to support the Commissioner's factual findings, they are conclusive and must be upheld." *Stemmerman v. Colvin*, No. 13-CV-241 (SLT), 2014 WL 4161964, at *6 (E.D.N.Y. Aug. 19, 2014) (citing 42 U.S.C. § 405(g)). "This deferential standard of review does not apply, however, to the ALJ's legal conclusions." *Hilsdorf v. Comm'r of Soc. Sec.*, 724 F. Supp. 2d 330, 342 (E.D.N.Y. 2010). Rather, "[w]here an error of law has been made that might have affected the disposition of the case, [an ALJ's] failure to apply the correct legal standards is grounds for reversal." *Pollard v. Halter*, 377 F.3d 183, 189 (2d Cir. 2004) (internal quotation marks omitted).

## II.  Eligibility for Disability Benefits

"To be eligible for disability insurance benefits, an applicant must be 'insured for disability insurance benefits," *Arnone v. Bowen*, 882 F.2d 34, 37 (2d Cir. 1989) (quoting 42 U.S.C. §§ 423(a)(1)(A), (c)(1)); and must satisfy certain earnings requirements. *Hartfiel v. Apfel*, 192 F. Supp. 2d 41, 42 n.1 (W.D.N.Y. 2001). "Generally, an applicant must apply for benefits during the period in which she satisfies these earning requirements. If the applicant does not apply for benefits during this period, she may still obtain benefits if she has been under a continuous period of disability that began when she was eligible to receive benefits." *Hartfiel*, 192 F. Supp. 2d at 42 n.1.

To qualify for both disability insurance and SSI benefits, an individual must show that she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(A). This requires a five-step analysis for determining whether a claimant is disabled:

> [1] First, the Commissioner considers whether the claimant is currently engaged in substantial gainful activity.
>
> [2] If he is not, the Commissioner next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities.
>
> [3] If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the Commissioner will consider him *per se* disabled.
>
> [4] Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work.
>
> [5] Finally, if the claimant is unable to perform his past work, the Commissioner then determines whether there is other work which the claimant could perform.

*Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012) (quoting *DeChirico v. Callahan*, 134 F.3d 1177, 1179–80 (2d Cir. 1998)); *see also* 20 C.F.R. §§ 404.1520, 416.920. The claimant has the burden of proof for the first four steps of the analysis, but the burden shifts to the Commissioner for the fifth step. *See Talavera*, 697 F.3d at 151.

## DISCUSSION

In support of her motion for judgment on the pleadings, Carreto argues that (1) new and material evidence reveals that her back condition was worse than was understood at the time of

the administrative proceedings; (2) the ALJ failed to properly apply the treating physician rule and did not give sufficient consideration to Dr. Letcher's medical opinion; and (3) the ALJ selectively used evidence to support a finding of no disability. (Pl.'s Mem. Supp. Cross-Mot. at 14, 18, 21.) Because the Court grants Carreto a remand for consideration of new medical evidence, it does not reach her second and third contentions, as "[o]n remand, the Commissioner may resolve the case in such a way that consideration of the other issues is not necessary." *Clemons v. Astrue*, 12-CV-269A (HBS), 2013 WL 4542730, at \*5 (W.D.N.Y. Aug. 27, 2013).

A court may consider new evidence as a basis to remand for further proceedings. 42 U.S.C. § 405(g); *see also Lisa v. Sec'y of the Dep't of Health and Human Servs.*, 940 F.2d 40, 43 (2d Cir. 1991). A court may order a remand if the evidence is both new and material and, in cases where the new evidence was not submitted to the Appeals Council, there is the additional requirement that the claimant show good cause for the failure to incorporate such evidence into the record in a prior proceeding. 42 U.S.C. § 405(g); *Tirado v. Bowen*, 842 F.2d 595, 597 (2d Cir. 1988); *Cammy v. Colvin*, No. 12-CV-5810 (KAM), 2015 WL 6029187, at \*20 (E.D.N.Y. Oct. 15, 2015). "New" evidence means evidence that is not merely cumulative of what is already in the record. *Lisa*, 940 F.2d at 43. "Material" evidence is evidence that is both relevant to the period for which benefits have been denied and probative. *Lisa*, 940 F.2d at 43. In addition, the concept of materiality requires "a reasonable possibility that the new evidence would have influenced the [Commissioner] to decide claimant's application differently." *Id.*

Here, Carreto presents two sets of evidence that post-date the hearing in front of the ALJ. The first set was submitted to the Appeals Council and includes two MRI reports, the first of which was taken on August 28, 2013, just months after the hearing in front of the ALJ. This August 2013 MRI shows a worsening of previously diagnosed conditions and reveals L2–S1

degenerative disc disease, L2–L5 retrolisthesis, an annular fissure at L3–L4, and slight levoscoliosis.  (Admin. R. at 6–9.)  The second MRI, taken on August 6, 2014, shows slight retrolesthesis of C5 on C6, and straightening and mild reversal of the normal cervical spine lordosis.  (*Id.* at 15.)  Carreto also presents a treatment note from NP Fraser, dated November 14, 2013, in which NP Fraser stated that Carreto "is only able to walk 1–1.5 block[s] before she needs to rest 15 minutes"; that she "is off balanced and has had near falls"; and that "due to the chronic deficits from her injury she is unable to work at this time."  (*Id.* at 5.)  She submits the results of an electrodiagnostic study, performed December 26, 2013, which found signs of acute right lumbar radiculopathy.  (*Id.* at 10–14.)  Finally, she presents records of two epidural steroid injections, performed on April 8, 2014 and September 9, 2014, to treat her L4–L5 lumbar radiculitis.  (*Id.* at 16–17.)  The second set of evidence is presented for the first time in this action, and includes records of a third epidural injection, a physical therapy session, and two new MRIs showing further degeneration of Carreto's spinal conditions, all from 2015.  Defendant maintains that remand is not warranted as "the additional evidence provided is not material to the period at issue here."  (Def.'s Reply Mem. at 7.)

Carreto easily satisfies the requirements that the submitted evidence be new and that she have good cause for not presenting the second set of evidence at a previous proceeding.  All of the additional evidence submitted by Carreto is new and non-duplicative, satisfying the first element of the test for remand.  *See Lisa*, 940 F.2d at 43.  She has shown good cause for not having produced the second set of evidence at prior proceedings as the evidence is from after the ALJ's hearing.  *See Lisa*, 940 F.2d at 44 ("Good cause for failing to present evidence in a prior proceeding exists where . . . the evidence surfaces after the Secretary's final decision and the claimant could not have obtained the evidence during the pendency of that proceeding."); *see*

*also Lopez v. Astrue*, No. 09-CV-1678 (CBA), 2011 WL 6000550, at *11 (E.D.N.Y. Nov. 28, 2011) (finding good cause for not presenting evidence at a prior hearing where "the documents clearly indicate that the[] new MRI tests were not performed until after the ALJ's decision").

To meet the materiality requirement, evidence must be relevant to the time period at issue, must be probative, and must introduce the reasonable possibility that the new evidence would have prompted the Commissioner to decide claimant's application differently. *Lisa*, 940 F.2d at 43. Here, all three requirements are met by the new evidence submitted by Carreto.

The evidence from 2013 submitted to the Appeals Council suggests that Carreto's back condition at the time of the hearing could have been far worse than previously known, as the MRI and other evidence that show the severity of her condition were created just months after the hearing in front of the ALJ. *See Pollard*, 377 F.3d at 193 ("Although the new evidence consists of documents generated after the ALJ rendered his decision, this does not necessarily mean that it had no bearing on the Commissioner's evaluation of [the claimant's] claims. To the contrary, the evidence directly supports many . . . earlier contentions regarding [the claimant's] condition. It strongly suggests that, during the relevant time period, [his] condition was far more serious than previously thought."); *Ortiz v. Comm'r of Soc. Sec.*, No. 15-CV-3966 (BMC), 2016 WL 3264162, at *5 (E.D.N.Y. June 14, 2016) ("When a diagnosis emerges after the close of administrative proceedings that sheds considerable new light on the seriousness of a claimant's condition, evidence of that diagnosis is material and justifies remand." (internal quotation marks omitted)); *Sergenton v. Barnhart*, 470 F. Supp. 2d 194, 204 (E.D.N.Y. 2007) (collecting cases). Thus, the 2013 evidence is relevant to whether Carreto was disabled between March 31, 2010 and April 15, 2013.

This 2013 evidence is probative as it directly bears on the severity of Carreto's claimed disability. *See Szubak v. Sec'y of Health and Human Servs.*, 745 F. 2d 831, 833 (3d Cir. 1984) (remanding case for further review where new evidence appeared to "corroborate substantially appellant's subjective complaints of great pain"); *Sistrunk v. Colvin*, No. 14-CV-3208 (JG), 2015 WL 403207, at *7–*8 (E.D.N.Y. 2015) (finding in back pain case that additional evidence post-dating the ALJ's decision was material because it showed the progression of a degenerative condition and "lend[ed] credibility to [the claimant's] testimony at the hearing"); *Segarra v. Apfel*, 58 F. Supp. 2d 26, 34 (E.D.N.Y. 1999) (finding that an MRI evaluation report post-dating the ALJ's decision and pertaining to previously considered spinal conditions was material).

There is also a reasonable probability that the 2013 evidence would have caused the Commissioner to decide Carreto's application differently. The ALJ found that "the claimant is not a credible reporter of symptoms and limitations" and that Carreto may have exaggerated the extent to which she was limited by her conditions. (Admin. R. at 32–33.) Because this credibility determination was based in part on test results not fully supporting Carreto's report of her symptoms, evidence of a progressively worsening degenerative condition could have changed the ALJ's credibility determination. Further, the ALJ stated that "there are no objective electrodiagnostic studies to support the claimant's assertion that she has tingling, pain, and numbness in her right foot." (*Id.* at 33.) The August 2013 MRI shows nerve compression and foraminal narrowing in the lumbar spine, and the electrodiagnostic study performed in December 2013 indicates acute right lumbar radiculopathy. (*Id.* at 5–14.) These results, produced within months of the ALJ's determination, provide direct evidence of nerve pain, tingling, and numbness in the right foot, raising the possibility that the ALJ would have come to a different conclusion regarding the credibility of Carreto's complaints of pain, tingling, and numbness. *See*

*Cammy*, 2015 WL 6029187, at *22 (remanding matter where "the ALJ disregarded plaintiff's self-reports . . . , and did not afford significant weight to any of the treating or consultative physicians' opinions, [but] new evidence would be a material factor in the ALJ's assessment of plaintiff's RFC." (brackets, internal quotation marks, and citation omitted)); *Rolon v. Comm'r of Soc. Sec.*, 994 F. Supp. 2d 496, 510 (S.D.N.Y. 2014) (remanding matter for consideration of CT scans post-dating hearing in front of ALJ where the ALJ had found the claimant's report of symptoms and a medical opinion not credible due to a lack of support in the medical evidence).

Although the evidence submitted by Carreto from 2014 and 2015 was created more than a year after the ALJ's hearing, it helps present a full picture of the degenerative and serious nature of Carreto's condition. *See Lisa*, 940 F.2d at 44 (finding material evidence is that which "sheds considerable new light on the seriousness of [a claimaint's] condition"). This 2014 and 2015 evidence lends credibility to Carreto's descriptions of her condition and directly relates to the disabilities that she claimed at the 2013 hearing. Because it is probative and may not concern "a later-acquired disability," *Estevez v. Apfel*, No. 97-CV-4034 (JGK), 1998 WL 872410, at *7 (S.D.N.Y. Dec 14, 1998) (quoting *Szubak*, 745 F. 2d at 833), the evidence is material and should be considered on remand.

Thus, for the reasons stated above, remand is warranted for consideration of all of the additional evidence that Carreto submitted.

## CONCLUSION

For the reasons stated herein, the Commissioner's motion for judgment on the pleadings is denied and Carreto's cross-motion for judgment on the pleadings is granted to the extent that this matter is remanded to the Commissioner for further proceedings to consider new evidence consistent with this opinion.

The Clerk of Court is respectfully directed to enter judgment accordingly and close this case.

SO ORDERED.

Dated: Brooklyn, New York
      August 30, 2016

*Roslynn R. Mauskopf*

—————————————
ROSLYNN R. MAUSKOPF
United States District Judge